# United States Court of Appeals for the Federal Circuit

---

**MARK L. SADLER,**
*Petitioner*

**v.**

**DEPARTMENT OF THE ARMY,**
*Respondent*

---

2023-1981

---

Petition for review of the Merit Systems Protection Board in No. DE-1221-16-0122-W-1.

---

Decided: February 25, 2025

---

ADAM AUGUSTINE CARTER, The Employment Law Group, PC, Washington, DC, argued for petitioner. Also represented by ROBERT SCOTT OSWALD.

BRITTNEY M. WELCH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, CORINNE ANNE NIOSI.

---

Before DYK, CLEVENGER, and HUGHES, *Circuit Judges*.

DYK, *Circuit Judge*.

Petitioner Mark L. Sadler was employed by the United States Army until the Army suspended him and then removed him for insubordination. Mr. Sadler alleged that the suspension and removal were retaliation in violation of the Whistleblower Protection Act and sought corrective action at the Merit Systems Protection Board ("Board"). In the course of the Board proceedings, Mr. Sadler moved for the Board to sanction the government for destruction of evidence. The Board ultimately denied Mr. Sadler's motion for sanctions and his request for corrective action. We affirm.

## BACKGROUND

This case involves two whistleblower complaints filed by Mr. Sadler. Mr. Sadler contends the Board erred in concluding that his first Office of Special Counsel ("OSC") complaint failed to sufficiently allege protected activity and, with respect to his second OSC complaint, the Board, though finding protected activity, erred in concluding that the government had shown by clear and convincing evidence that it would have taken the same actions absent the protected activity. The facts are somewhat complex.

Mr. Sadler was employed by the Army starting in September 2009 as a Computer Scientist, GS-13, in the Test Technology Division. In April 2012, Mr. Sadler was transferred to the Data Sciences Division, where his supervisor was Branch Chief Quentin Stringham.

On October 11, 2012, Mr. Stringham emailed Mr. Sadler to set "objectives for [Mr. Sadler's] performance evaluation." J.A. 2019. The October 12 email assigned Mr. Sadler the task of developing and supporting a "software testing program." *Id.* On October 17, 2012, Mr. Stringham reiterated that he had asked Mr. Sadler "to put together a plan for developing a software testing program." J.A. 1377.

The software testing program was to be developed so that it "can be executed in conjunction with [the] contractor."[1] J.A. 2019. Developing the software testing program included delivering a testing process and a document that "outline[d] the testing process and all deliverables, responsibilities and measurements associated with [the] required testing activities." J.A. 2019. Mr. Stringham proposed a completion date "no later than" December 31, 2012. Mr. Sadler "took steps in accordance with that plan, including reviewing the contract [relevant to the software testing program and] meeting with" employees of the contractor. J.A. 11; *see also* J.A. 2814–20 (Mr. Sadler's testimony). However, Mr. Sadler testified that he came to believe that the assignment to create the software testing program "seemed to be inappropriate" because he "would have been injecting [himself] into the contractor's [software] development processes," which already included software testing. J.A. 2819–20.

In January 2013, Mr. Sadler emailed his second-line supervisor, Tracy Mullendore, and a higher-level Army official, Colonel A. Scott Estes, with concerns about his assigned task. That month, Mr. Sadler also submitted a revised project plan to Mr. Stringham. Mr. Sadler indicated he would provide a draft document describing the steps of the software testing process by February 14, 2013, and a final version of the document by March 18, 2013.

---

[1]    Mr. Sadler asserts, and the government does not dispute, that the "contractor," J.A. 2019, Mr. Stringham referred to in his October 12 email is IP Network Solutions. *See* Pet'r's Br. 5–6; J.A. 2461–63. IP Network Solutions had a contract with the government to provide "software administration and maintenance as well as full software development life-cycle projects . . . in support of the Test Mission Management System." J.A. 1737; *see, e.g.*, J.A. 1715, 1737–41, 1871–1935.

Mr. Sadler never provided either document to Mr. Stringham.

On February 13, 2013, Mr. Sadler and Mr. Stringham met to discuss Mr. Sadler's progress. Mr. Sadler declined to provide a current status of his task. On February 19, 2013, Mr. Stringham instructed Mr. Sadler to "provide all information and documentation [he had] created/compiled pursuant to [this task]" by close of business and informed him that "[f]ailure to comply with this instruction or any other instruction could result in formal disciplinary action." J.A. 1414 ¶¶ 7, 9. Mr. Sadler responded to this instruction by emailing Mr. Stringham and Mr. Mullendore, copying Col. Estes and others, stating that "[t]here ha[d] been no new activity on the referenced task." J.A. 1659.

On March 14, 2013, Mr. Sadler filed a first complaint with OSC alleging whistleblower retaliation. Mr. Sadler's allegations as to what agency personnel actions were taken against him are unclear. But in his first OSC complaint, Mr. Sadler alleged that he made protected disclosures that included "[p]ossible improprieties between [Mr. Stringham] and his contract employees" and "[p]ossible [f]raud/[w]aste/[a]buse . . . [by diverting] funds for critical software safety tools . . . to [a] new computer floor[.]" J.A. 2138–39. On April 16, 2013, OSC terminated its inquiry into Mr. Sadler's allegations, and on June 18, 2013, Mr. Sadler appealed to the Board.

On June 26, 2013, after the filing of Mr. Sadler's first OSC complaint, Mr. Stringham proposed suspending Mr. Sadler for five days for insubordination. On August 5, 2013, Mr. Mullendore implemented the suspension, although he mitigated the penalty from five days to four, effective August 12 through August 15, 2013. On August 7, 2013, Mr. Sadler received an unfavorable performance rating.

On August 19, 2013, Mr. Stringham sent Mr. Sadler an email asking about the status of the assigned task.

Mr. Sadler replied that there was "[n]o change." J.A. 1694. On August 21, 2013, Mr. Stringham proposed removing Mr. Sadler for insubordination. On August 22, 2013, in light of the proposed removal, the Board administrative judge ("AJ") dismissed Mr. Sadler's first Board appeal without prejudice "to allow [Mr. Sadler] to exhaust his remedies with OSC concerning his allegation that the August 7, 2013 suspension was retaliation for whistleblowing activity." J.A. 20.

On August 31, 2013, Mr. Sadler filed a second OSC complaint, alleging further whistleblower retaliation for the filing of his first OSC complaint and appeal; Mr. Sadler alleged the retaliation included the "four[-]day suspension," "unsatisfactory performance report," and "proposed removal." J.A. 2215. On September 23, 2013, the Army removed Mr. Sadler from his position. In October 2015, OSC informed Mr. Sadler that it had terminated its inquiry into his second OSC complaint. Thereafter, Mr. Sadler filed his second appeal with the Board; the Board apparently treated this action as reviving the first OSC complaint and addressed both complaints together.

As part of his second Board appeal, the parties engaged in discovery. Mr. Sadler ultimately filed a motion for sanctions, alleging that the Army lost or destroyed critical evidence: Col. Estes's computer files, specifically his ".pst file,"[2] which contained archived emails and documents. *See* J.A. 971–77. Mr. Sadler did not complain in his motion that the Army had destroyed other evidence. However, Mr. Sadler also alleged that the Army failed to identify and produce other discovery material, such as material from

---

[2] A .pst file is an electronic storage file format that can be used to store data. The .pst format is commonly used to archive data, such as email messages, calendar information, and contacts, from Microsoft programs, like Microsoft Outlook.

"Mr. Mullendore's computer 'backup copy'" and chat logs from a messaging service, IBM Sametime. J.A. 971–72 ¶ 2, 974 ¶ 9. In a later-filed rebuttal, Mr. Sadler clarified he "d[id] not seek sanctions pursuant to 5 C.F.R. § 1201.74(c) for failure to comply with a discovery order" but instead "s[ought] sanctions for the loss or destruction of relevant evidence"—i.e., spoliation. Appellant's Rebuttal to Agency's Response to Motion for Sanctions ¶ 2, Sadler v. Dep't of Army, MSPB No. DE-1221-16-0122-W-1; *accord* J.A. 2439 n.1. In subsequent supplemental memoranda, however, Mr. Sadler alleged that the Army failed to identify and preserve other relevant evidence beyond Col. Estes's files. For example, Mr. Sadler pointed to "the failure of anyone to backup [sic] and retain files relating to Mr. Sadler until . . . January 2015" and the "loss of a substantial body of material submitted to the OSC during 2015." J.A. 1161.

The AJ denied Mr. Sadler's motion for sanctions. The AJ explained his reasoning in his original order dated January 20, 2017, and in his decision denying reconsideration dated September 25, 2017. The AJ limited his analysis to Col. Estes's .pst file, finding that Mr. Sadler had disclaimed any theory that he was requesting sanctions for failure to comply with an order compelling discovery under 5 C.F.R. § 1201.74(c). The AJ found that in 2013, Col. Estes created the .pst file "on his laptop hard drive (and likely on an external hard drive)," J.A. 2439, and that the file contained information "relevant to [Mr. Sadler's] pending litigation," J.A. 2441. The AJ further found that the Army "wiped and reimaged" the hard drive after Col. Estes left his command and that "the external hard drive was, . . . most likely, shredded." J.A. 2439–40. However, the AJ concluded that the .pst file was lost due to "an ordinary procedure when there was a change in command" and so declined to exercise his discretion by sanctioning the Army. J.A. 2441. Mr. Sadler moved for reconsideration.

In denying reconsideration, the AJ followed the standard for the failure to preserve electronically stored information adopted in the 2015 amendments to Rule 37(e) of the Federal Rules of Civil Procedure, which requires a finding that "the party [that failed to preserve electronically stored information] acted with the intent to deprive another party of the information's use in the litigation" in order to apply adverse inferences. FED. R. CIV. P. 37(e)(2).

In the September 2017 decision (which included the denial of reconsideration of the sanctions issue), the AJ denied Mr. Sadler's request for corrective action. The AJ concluded the Board lacked jurisdiction over Mr. Sadler's first OSC complaint, concluding it did not contain a protected disclosure because "a reasonable person in [Mr. Sadler's] position would not believe [that the disclosures alleged in his first OSC complaint] evidenced a violation of any law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety within the meaning of [5 U.S.C. § 2302(b)(8)]." J.A. 32.

As to Mr. Sadler's second OSC complaint, the AJ found that Mr. Sadler had engaged in protected whistleblower activity—namely, (1) filing his first OSC complaint on March 4, 2013, and (2) appealing his first OSC complaint to the Board on June 18, 2013. The AJ also found that these protected activities were a contributing factor in the Army's personnel actions against Mr. Sadler. The AJ then found, however, that the Army established by clear and convincing evidence that it would have taken the same actions absent Mr. Sadler's protected activities—i.e., that the Army had established independent causation.

In April 2023, the full Board denied Mr. Sadler's petition for review and affirmed the AJ's initial decision, which became the Board's final decision.

Mr. Sadler seeks review of the Board's decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) and 5 U.S.C. § 7703(b)(1)(A).

## DISCUSSION

Our review of final Board decisions is limited. We may only set aside agency actions, findings, or conclusions we find to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). We review legal questions de novo. *Rumsey v. Dep't of Just.*, 866 F.3d 1375, 1379 (Fed. Cir. 2017). We review the Board's rulings on discovery issues for abuse of discretion. *Kirkendall v. Dep't of Army*, 573 F.3d 1318, 1321 (Fed. Cir. 2009).

## I.    First OSC Complaint

Mr. Sadler argues the Board erred in concluding that the disclosures he identified in his first OSC complaint were not protected disclosures under 5 U.S.C. § 2302(b)(8).[3] We disagree.

For the Board to have jurisdiction over Mr. Sadler's first OSC complaint, he was required to present a nonfrivolous allegation that he made a protected disclosure. *Cahill v. Merit Sys. Prot. Bd.*, 821 F.3d 1370, 1373 (Fed. Cir. 2016). Nonfrivolous allegations are allegations that are not vague, conclusory, or facially insufficient, and that the petitioner reasonably believes to be true. *Piccolo v. Merit Sys. Prot. Bd.*, 869 F.3d 1369, 1371 (Fed. Cir. 2017). Protected disclosures include "any disclosure of information by

---

[3]    As noted earlier, it is not clear what personnel actions Mr. Sadler alleged were retaliatory in the first OSC complaint, and the Board did not address this requirement in its final decision.

an employee . . . which the employee . . . reasonably be-lieves evidences[] (i) any violation of any law, rule, or reg-ulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8); *see also id.* § 2302(a)(2)(D) (defining "disclosure").

The Board properly found that Mr. Sadler's allegations in his first OSC complaint were not protected disclosures within the meaning of Section 2302(b)(8) because his alle-gations were vague, conclusory, and failed to reveal circum-stances from which a disinterested person in his position could reasonably conclude that the agency's actions evi-denced any of the violations described in that section. *See Piccolo,* 869 F.3d at 1371; *Lachance v. White,* 174 F.3d 1378, 1381 (Fed. Cir. 1999).

On appeal, Mr. Sadler argues that (1) the cancellation of funding for certain software tools evidenced a "gross waste of funds"; (2) the cancellation of funding for the soft-ware tools while providing funding for a new computer room floor evidenced "gross mismanagement"; (3) his as-signment to work on the software development task evi-denced an "abuse of authority" because it resulted in personal gain for Mr. Stringham; and (4) his assignment to work on the software development task was to the detri-ment of his other employment responsibilities and thus ev-idenced "a substantial and specific danger to public health or safety." *See* Pet'r's Br. 51–63. As the Board found, the problem common to each of these arguments is that Mr. Sadler failed to allege the substantive details required to establish jurisdiction. *See Ellison v. Merit Sys. Prot. Bd.*, 7 F.3d 1031, 1036 (Fed. Cir. 1993); *ElHelbawy v. Dep't of Com.*, No. 2023-1322, 2023 WL 8494706, at *3 (Fed. Cir. Dec. 8, 2023) (nonprecedential) (per curiam).

Mr. Sadler also argues that the Board "failed to con-sider whether [his] disclosures constituted a disclosure of violations of law, rules or regulation." Pet'r's Br. 43. We

disagree.  He argues that his assignment to develop a software testing program "violat[ed] the DoD directives which created [his] position," forcing him to abandon tasks identified in his original position description in violation of various government policy bulletins.  *Id.* at 44–45.  These arguments are likewise without merit.  Mr. Sadler has not shown a colorable violation of any law, rule, or regulation.[4]

Accordingly, we conclude the Board did not err in finding that Mr. Sadler failed to nonfrivolously allege in his first OSC complaint that he engaged in activity protected by 5 U.S.C. § 2302(b)(8).

## II.  Second OSC Complaint

We now turn to the Board's determination that the agency demonstrated by clear and convincing evidence that it would have taken the same actions against Mr. Sadler absent his protected whistleblowing activity (i.e., filing his first OSC complaint and then appealing his first OSC complaint to the Board).  *See* J.A. 38–39; 5 U.S.C. § 1221(e)(2).

---

[4]     To the extent Mr. Sadler now argues that his refusal to complete his assigned tasking was protected activity under Section 2302(b)(9)(D), which protects an individual who "refus[ed] to obey an order that would require the individual to violate a law, rule, or regulation," he did not raise these arguments to the Board and they are forfeited.  *See, e.g.*, *Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 953 n.1 (Fed. Cir. 2020) (finding argument forfeited for failure to present it to AJ in the first instance).  Mr. Sadler additionally argues that he "reasonably believed that [Mr.] Stringham's actions concerning the use of the contractors violated the [Federal Acquisition Regulations]."  Pet'r's Br. 48.  Mr. Sadler concedes that he did not raise this argument to the Board.  *See* Pet'r's Reply Br. 22.  We decline to consider it in the first instance.  *See, e.g.*, *Sistek*, 955 F.3d at 953 n.1.

In this context, we apply three factors set forth in *Carr v. Social Security Administration*, 185 F.3d 1318, 1322 (Fed. Cir. 1999). The three Carr factors are:

> 1) the strength of the [Army's] evidence in support of its action, 2) the existence and strength of any motive to retaliate on the part of the [Army] officials who participated in the decision, and 3) any evidence that the [Army] takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*McIntosh v. Dep't of Def.*, 53 F.4th 630, 645 (Fed. Cir. 2022) (citing *Carr*, 185 F.3d at 1323). Mr. Sadler disputes the Board's finding only as to the first and second *Carr* factors.

As to the first *Carr* factor, the Board considered the Army's "straightforward and largely uncontroverted" evidence that Mr. Sadler was insubordinate and determined that "the evidence strongly supports the [Army's] actions in imposing discipline for insubordination in the form of suspension and later removal." J.A. 39–41. Regarding suspension, the Board's conclusion is supported at least by the following undisputed facts: (1) Mr. Sadler refused to provide status updates on his assigned task to his supervisor Mr. Stringham; (2) Mr. Stringham warned Mr. Sadler that failure to comply with instructions "could result in formal disciplinary action," J.A. 1414 ¶ 9; (3) Mr. Stringham then gave Mr. Sadler instructions to complete the assigned task and assigned expected due dates; and (4) Mr. Sadler failed to comply with those instructions or meet those expected due dates. Regarding removal, after returning from his suspension, Mr. Sadler continued to fail to comply with previous instructions to make progress on his assigned task. *See* J.A. 1694 (email from Mr. Sadler indicating there was "[n]o change" in the status of the assigned task). Based on this record, we conclude that substantial evidence supports the Board's finding in favor of the Army as to the first *Carr* factor.

Mr. Sadler also argues that his actions could not constitute insubordination because the Army failed to respond to Mr. Sadler's complaints about his assigned tasks. Our precedent establishes no such principle. While complaints may constitute protected whistleblowing, Mr. Sadler's complaints here do not excuse his failure to perform his assigned tasks. *See* n. 4 *supra.*

Mr. Sadler argues his suspension and removal constituted impermissible double punishment for the same misconduct. *See Nguyen v. Dep't of Homeland Sec.*, 737 F.3d 711, 716–17 (Fed. Cir. 2013) (explaining the Board has prohibited double punishment in cases where an agency imposed two separate instances of discipline for the same act of misconduct). His arguments are unavailing. The Army's second adverse action (removal) was not based on the *same* incident of refusing to comply with instructions as the first adverse action (suspension). Instead, the second adverse action was based on Mr. Sadler's *continued* refusal to comply with his ongoing instructions to complete the assigned task. We see no error in the Board's analysis of the first *Carr* factor.

As to the second *Carr* factor, the Board found it weighed in favor of the Army because there was "little evidence that the [Army] retaliated against [Mr. Sadler] for protected activity." J.A. 41. This determination is likewise supported by substantial evidence. The Board found Mr. Sadler engaged in the protected activity of (1) filing a first complaint with OSC on March 4, 2013, and (2) appealing his first OSC complaint to the Board on June 18, 2013. J.A. 33. As the Board explained, Mr. Sadler's supervisors discussed Mr. Sadler's insubordination in February 2013, i.e., before he engaged in any protected activity. The Board reviewed the timing of the Army's actions as compared to the protected activity and concluded there was no evidence to suggest Mr. Sadler's supervisors were aware of the protected activity until after they began formal discussions about suspending him. The Board also found credible

testimony that Mr. Stringham and Mr. Mullendore did not factor Mr. Sadler's first Board appeal into the decision to suspend or remove Mr. Sadler. Based on this record, substantial evidence supports the Board's conclusion that the second *Carr* factor weighed in favor of the Army. And to the extent Mr. Sadler asks us to review the credibility determinations, we see no basis to set them aside. *See Bieber v. Dep't of Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.").

We conclude substantial evidence supports the Board's determination that the Army met its burden to show independent causation.

### III. Sanctions for Spoliation

Mr. Sadler finally argues the Board abused its discretion in declining to draw adverse inferences against the Army due to the destruction of Col. Estes's .pst file (spoliation).[5] The term "spoliation" encompasses destruction of

---

[5] On appeal, Mr. Sadler accuses the Board of "limit[ing] its decision to Col. Estes's .pst files and . . . not address[ing] other matters [Mr.] Sadler raised [in his motion for sanctions]." Pet'r's Br. 22. It is unclear to which "other matters" Mr. Sadler refers. To the extent Mr. Sadler is referring to the Army's failure to produce, or explain why it did not produce, certain documents in violation of the Board's order granting his motion to compel, Mr. Sadler expressly stated to the Board that he "d[id] not seek sanctions pursuant to 5 C.F.R. § 1201.74(c) for failure to comply with a discovery order." Appellant's Rebuttal to Agency's Response to Motion for Sanctions ¶ 2, Sadler v. Dep't of Army, MSPB No. DE-1221-16-0122-W-1. In his motion for sanctions, the only information Mr. Sadler complained was destroyed by the Army was Col. Estes's files.

evidence and failure to preserve evidence. *See, e.g.*, 22 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure: Evidence* § 5178.2 (2d ed.).

The Board's statutes and regulations do not address spoliation of evidence or sanctions for spoliation, but the regulations provide that an administrative judge "may impose sanctions upon the parties as necessary to serve the ends of justice." 5 C.F.R. § 1201.43; *see id.* § 1201.41. The Board considers the Federal Rules of Civil Procedure "a general guide for discovery practice[]." *Id.* § 1201.72(a). "Procedural matters relative to discovery and evidentiary issues fall within the sound discretion of the [B]oard and its officials." *Higgins v. Dep't of Veterans Affs.*, 955 F.3d 1347, 1356 (Fed. Cir. 2020) (quoting *Curtin v. Off. of Pers. Mgmt.*, 846 F.2d 1373, 1378 (Fed. Cir. 1988)).

The parties do not appear to dispute the Board's findings that the Army had an obligation to preserve the hard drive containing Col. Estes's .pst file; that the information contained in Col. Estes's .pst file was relevant to Mr. Sadler's case; and that the Army failed to preserve the .pst file because the Army wiped and reimaged the hard drive. The parties instead dispute what state of mind can serve as the basis for imposing an adverse inference sanction for the destruction of relevant evidence and whether the Board appropriately applied the correct standard.

In denying Mr. Sadler's motion for reconsideration, the Board "decline[d] to exercise [its] discretion to draw an

---

We see no error in the AJ's decision to decline to address arguments raised for the first time in Mr. Sadler's later-filed second supplemental memorandum on the sanctions issue as to other files. To the extent that the AJ did not address the destruction of any of Col. Estes's files other than the .pst files, that failure was harmless because the same rationale would apply.

adverse inference against the [Army] or impose other sanctions for spoliation" and found unpersuasive Mr. Sadler's argument that "*per se* negligence" was sufficient to warrant sanctions for spoliation.  J.A. 22 (internal citation omitted).

## A

Mr. Sadler contends that the Board erred in not applying the negligence standard recognized in our decision in *Kirkendall* and instead applying the intent standard of Rule 37(e) of the Federal Rules of Civil Procedure.

We are unpersuaded by Mr. Sadler's argument that the Board failed to follow our decision in *Kirkendall*.  In *Kirkendall*, the Board rejected the petitioner's motion for sanctions for destruction of evidence, noting only that an adverse inference was "unwarranted under the circumstances."  573 F.3d at 1326.  We concluded that, under the Board's precedent in *Natividad v. Dep't of Agric.*, 5 M.S.P.R. 415 (M.S.P.B. 1981), negligent destruction of evidence can result in an adverse inference sanction. *Kirkendall*, 573 F.3d at 1327 (citing *Natividad*, 5 M.S.P.R. at 418).  We vacated the Board's decision and remanded because the Board, without explanation and in conflict with its precedent, applied a stricter standard than negligence. *Id.*  We did not hold that negligence was the correct standard.  *See id.*

Even at the time of *Kirkendall*, there was a split in the circuits as to the requisite state of mind for a court to apply an adverse inference for destruction of evidence.  Some circuits held that the party seeking an adverse inference for destruction of evidence was required to establish that the evidence was destroyed "with a culpable state of mind," which can be "satisfied by a showing that the evidence was destroyed 'knowingly . . . or *negligently*,'" or on a finding of *gross negligence.  Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001) (emphasis added)); *see also United States v. Rose*, 590 F.2d

232, 237 (7th Cir. 1978); *United States v. Miranda*, 526 F.2d 1319, 1325–28 (2d Cir. 1975). The Board in *Natividad* relied on the circuit precedent in *Rose* and *Miranda*. *See Natividad*, 5 M.S.P.R. at 428 (first citing *Rose*, 590 F.2d at 237; and then citing *Miranda*, 526 F.2d at 1325–28). Other courts had held that "[m]ere negligence in losing or destroying records is not enough"—"[t]he adverse inference must be predicated on the *bad faith* of the party destroying the records." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (emphasis added); *see also Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005) (explaining that "an adverse inference against the destroyer of evidence [is permitted] only upon a showing of '*bad faith*' or '*bad conduct*.'" (emphases added) (quoting *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003)). Our own law acknowledged the "culpable state of mind" standard without deciding whether negligence was sufficient to meet that standard. *See Jandreau v. Nicholson*, 492 F.3d 1372, 1375–76 (Fed. Cir. 2007) (citing *Residential Funding*, 306 F.3d at 107). The 2015 amendments to Rule 37(e) resolved this split as to the failure to preserve electronically stored information and developed an "intent to deprive" standard for such cases. It is unclear what the standard under the Federal Rules is for spoliation of other types of evidence.

Under amended Rule 37(e), a court may impose an adverse inference sanction for failure to preserve electronically stored information "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."[6] The commentary to the

---

[6] Rule 37(e) states:

(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or

2015 amendments notes that new Rule 37(e)(2) expressly "rejects cases such as [*Residential Funding*, 306 F.3d 99] that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." FED. R. CIV. P. 37, Committee Notes on Rules—2015 Amendment.

We need not decide whether the Board is bound to follow the intent standard reflected in the 2015 amendments to Rule 37(e), but we conclude the Board did not abuse its discretion or act arbitrarily and capriciously by choosing to follow the new standard in Rule 37(e). Though the Rules are not controlling, the Board's regulations specifically provide that they are "instructive." 5 C.F.R. § 1201.72. It is thus appropriate for the Board to follow the instructive guidance of Rule 37 instead of earlier possibly relevant Board precedent approving a negligence standard (though that precedent did not directly address the special problems presented by electronically stored information). And in contrast to *Kirkendall* where the Board provided "no

---

conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: . . .

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

explanation" for denying the request for sanctions, 573 F.3d at 1326, here, the Board explained the rationale behind its decision. *See* J.A. 21–23.

## B

Mr. Sadler additionally argues the Board erred in relying on the 2015 amendments to Rule 37 because those amendments became effective on December 1, 2015, after the Army destroyed Col. Estes's .pst file between 2013 and early 2015. We disagree. The Board is not bound by Rule 37(e), but it reasonably looked to the Rule for guidance. In any event, it is not necessary for the amended Rule to have been in effect when the conduct occurred. When the Supreme Court amended the Rules in 2015, it provided "[t]hat the foregoing amendments . . . shall take effect on December 1, 2015, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." SUPREME COURT OF THE UNITED STATES, ORDER REGARDING AMENDMENTS TO THE FEDERAL RULES OF CIVIL PROCEDURE (2015). Mr. Sadler's proceeding was pending when the amendments took effect. Mr. Sadler filed his motion for sanctions on November 16, 2016, well after the amendments took effect.

## C

The Board also did not err in applying the standard to the facts of this case. In denying Mr. Sadler's motion for sanctions, the AJ first explained that destroying evidence as part of a regular business practice tends to weaken the inference that evidence was destroyed knowingly or negligently. *See* J.A. 2440–41 (citing *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 554 (6th Cir. 2010)); *see also Diaz v. Dep't of the Treasury*, 656 F. App'x 1000, 1002 (Fed. Cir. 2016) (nonprecedential) (finding the Board did not abuse its discretion in affirming AJ's decision not to draw adverse inferences where petitioner failed to timely request the destroyed evidence and the evidence was destroyed in the ordinary course of business). Here, the hard drive containing

Col. Estes's .pst file was destroyed as part of the Army's ordinary procedures. Under such circumstances, we see no error in the Board denying Mr. Sadler's request for sanctions under the higher intent standard of Rule 37(e).

In sum, the Board's decision was in accordance with law and was not arbitrary and capricious.

## CONCLUSION

We have considered Mr. Sadler's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the Board's decision.

## **AFFIRMED**

### COSTS

No costs.